Okay, the next argued case is number 17-1302, Cardiac Q-Valve Technologies against NeoVasc. Mr. Wolf. May it please the court. The primary challenge facing someone designing a mitral valve replacement is how to keep the valve where it's supposed to be through all of the stresses and strains it faces each time the heart beats. NeoVasc came up with a novel approach based on anchoring the implant to the fibrous scaffolding of the heart itself as opposed to the valve. That was a novel feature deserving of a patent, and indeed they got a patent. The district court's decision that Cardiac Q deserves a stake in that patent, a share of that patent, was based on a plain legal error. In Lilly v. Aerodyne, this court said, contribution of information in the prior art cannot give rise to joint inventorship. Can I ask, at least as to, was it the Chow reference? Yes, Your Honor. Yes. The prior art here is 102E prior art? Correct, Your Honor. Right. Have any of the joint inventorship cases that you rely on for the prior art contribution idea or argument that you make involve 102E prior art? No, Your Honor. Why doesn't that actually, A, make this distinctive, and B, make a substantive difference? Because the prior art that you're talking about maybe is, in fact, or was prior art for legal purposes, but was not, in fact, publicly available. It's this 102E has its own policies that there's certain kind of non-publicly available secret art that constitutes prior art, so as not to punish people for delays in the patent. I think, Your Honor, Levin summed it up best, and this is at 73, where the court said, we find it implausible to say that a person who contributed only to the non-novel and or obvious elements of a claim can be called an inventor. But not in a 102E context? Your Honor, but the point is, prior art has one meaning in the statute. What Your Honor's question implies is that we will have one definition of prior art for purposes of things like 102 and 103 analyses, and another definition of prior art for purposes of inventorship. Isn't it pertinent that the point in time at which the information was disclosed was before Chau was published? Not in the patent context. I believe what the district court did here is conflate the trade secret analysis with the patent analysis. If you didn't invent something- I don't understand. You're saying that if someone tells you something that you didn't know, and tells you under a nondisclosure agreement, and it ends up in a patent that schools out, none of the restrictions apply? No, Your Honor. Trade secret restrictions certainly apply. That's what trade secret law is for. But the question is, are you an inventor? In deciding whether or not someone's an inventor or not, we have to decide, did they come up with something that is patentable, that is different than the prior art, known or unknown, public or not public? As Levin suggests, if it's something you wouldn't have gotten a patent on in the first place, if it's something you couldn't have said, this is my patented invention, then why should you be able to claim a stake in something that is a patentable invention? To be a co-inventor, you don't have to come up with something that's outside the prior art. You simply have to contribute to the collective arrival at something that is novel and unknown. Your Honor, the cases take two lines on that. And we, again, not to use the word again, but we have to avoid conflation here. Two ways you can be a joint inventor. One is you can contribute something novel. Let's assume that a claim has limitations A, B, and C. Limitation C is new and novel. You contribute solely C. The other inventors contribute A and B. You're entitled to be a joint inventor in that context. The other way is if, and this is in Bard, for example, or excuse me, in Nartron, where you talk about the claimed invention as a whole. If you have a vision of A, B, and C, but only contribute to B, well, you've contributed as a whole to A, B, and C. But here, where C is the novel part, and you had nothing to do with C, you only, at best, contributed to A and B, which were known in the prior art. You argued to the PTO that there were other features that were also novel and patentable and contributed to the patentability. Did you not? Your Honor, the district court cited the discussion of Nguyen. But those arguments, the district court didn't match those up. The district court didn't, in her opinion, say that what you argued was novel was what was contributed purportedly by Cardiacu and the discussions prior to the patenting. At a minimum, what the district court should have done is accepted Chao as prior art, accepted Solem as prior art, which she didn't discuss at all, and say, all right, now I'm going to compare and see what was novel in the claim in light of the prior art, and compare that to what Cardiacu purportedly disclosed to Nieves in the relevant time frame. That analysis was never done. She talked about Nguyen in the prosecution, but didn't do the relevant comparison. But more importantly, she didn't address Chao or, again, Solem at all because of this legal error. Prior art is prior art, whether it's in the 102E context or the 102B context. I suggest we invite mischief if we start saying that it means different things in different statutory contexts. Is 102E gone? Is this issue of historical interest? That would be my best guess, Your Honor. I haven't done the exegesis completely, but I think that Historical mischief may be different from Your Honor, post-AIA, I believe that this is a creature of pre-AIA law. And Giacomini, which recognizes that 102E evaporates as a problem in light of the AIA. So with that, Your Honor, I think at a minimum what should be done is that the district court should be told to go back, look at what was prior art, and say, all right, was there anything that was truly novel that would have been patentable, that was not disclosed in prior art as properly construed, and do that analysis. Now, of course, since Cardiacube bore the burden of proof, we don't think this either needs to go back, that this is simply a case of reversal, that the arguments they make were not made below. They have to prove they're entitled to be named as co-inventors. And you don't get to do that in light of this record. So with that, if I could turn to the trade secret issues. As the trade secrets are defined, they are legally flawed as a matter of liability, and just as importantly, cannot support the damages requested. But with respect to the trade secrets, you didn't object to any of the jury instructions regarding trade secrets, did you? Your Honor, I'm not aware that trial counsel objected to the jury instructions. So absent any objection to the jury instructions, we have to assume that the legal standard that the jury employed is the correct one. Well, let's work backwards from trade secret six. The jury instructions were correct, were not objected to, at least by trial counsel. The question then on new trial was, did the evidence elicited support the verdict? And in saying that it did, the district court then misstated the law. The district court said- Well, can I ask this? If you had made a JMOL argument, which you didn't, it would be clear under Boyle against United Technologies, footnote five or something of R Markman, en banc, that the law that you're is the actual law, irrespective of whether, of whatever the law was described as being in the jury instructions. I have been unable to find whether that same principle work is in operation when it's a new trial motion for, this is a verdict against the weight of the evidence or whatever. And at least, do you have authority about that? No, Your Honor, and I'm not aware of any such authority, but that's in some ways beside the point, because we have an unusual circumstance here where the instruction given was correct. This is as to trade secret six. But then in the new trial denial, the district court restated her own instruction and restated it incorrectly. She correctly argued the standard of Massachusetts law that something had to be in continuous use. She then turned around in the new trial and said, well, but the evidence supports the verdict because, quote, they know what to do and what not to do. Well, the instruction she gave had nothing to do with what not to do. Yeah, but why? It seems to me that if you did not ask for an instruction that said what not to do is outside the protectable trade secrets, then you can't complain about that now if the answer to my earlier question is for new trial, as opposed to JMOL, you take the instructions as the law. Your Honor, the instruction given called for continuous use. By definition, if something is not being done, it is not in continuous use. I don't see why that's true. That is, every day I learn, I know, don't touch that button. I'm constantly deciding, don't put in this chemical, don't do this, don't do that. I have been shown in a secret confidential process that that would be a very bad thing to do. I think that's a gloss on the Massachusetts articulation that Massachusetts itself doesn't abide by. But again, this is not in the jury instructions. Well, understood. And there was no motion for JMOL on the substantive issue of whether it was qualified as a trade secret. That's correct, Your Honor. So you are under a very deferential standard here, and you have to say no reasonable jury could find that it's a trade secret. And as Judge Toronto says, if my trade secret to you is do it this way, but make sure you don't do it this way, then why is that not in continuous use if you're following that guideline? Because the materials development case at 97 says that continuous use means positive know-how, not negative know-how. That's my reading of that. Materials development is- A Massachusetts Superior Court case. 1971. Well, that's the only- Right. It hasn't been argued to be superseded. I mean, this is- 48 of 50 states have moved to pass the restatement. 48 of 50 states used the Uniform Trade Secret Act. So this is restatement law that we're dealing with here, not UTSA law. And this is restatement second, not restatement first? That's correct, Your Honor. That's a- I mean, I think it continues to this day. I mean, Texas was the last- You cited restatement of torts, right? Which is like 1938, and restatement second of torts is 1965. I didn't double-check, but I assume you meant the second? Yes, Your Honor. But the case was from post-restatement second. Right. Does that have precedential effect, an unpublished Superior Court, State Court decision, as the best evidence of the state's law? Your Honor, there's no dispute. Certainly, the athletes did not argue that we were anything other than restatement law. They didn't challenge our assertion of what the restatement was. I mean, the UTSA has unambiguously changed that law, but I don't believe it's- It's HOARY, but it's not incorrect. It's H-O-A-R-Y, Your Honor. But I don't believe it's an incorrect articulation. If we could talk briefly about trade secret four. The fundamental problem is that we don't know which one or more of the 60 plus combinations the jury found misappropriated, and thus can't test whether they were actually trade secrets under the relevant law. But you didn't ask for any special verdict in that regard. That's trial court, trial counsel did not ask for a special verdict. That's correct, Your Honor. You're really in a position of trying to retry this case, and there's nothing we can do about that. If trial counsel made some mistakes in terms of what they asked for or didn't ask for, there's nothing we can correct. Your Honor, at A85 note six, the district court criticized, expressed some frustration that the challenge to trade secret four wasn't raised on summary judgment. But the final sentence suggests that she considered the issue on the merits, rejected the position that Neovast took Palo, and under Massachusetts law, that is sufficient to preserve the issue. And so we believe that, as a practical matter, we don't know whether the jury found that it was component two and five, that that was the trade secret. We don't know whether it's one, three, and six. We do know that each of them individually was acknowledged to be well known in the prior art, and the judge said when that was challenged on new trial, well, that's taking it out of context. Well, unfortunately, the way it was presented and we need the context to know what the new trial motion is being tested against. I only have a minute or so, Your Honor, and I'd like to talk about this, most importantly, in the context of damages. Okay, proceed for a minute, and then we'll hear from the other side. Thank you, Your Honor. There are two fundamental problems with the damages analysis. The first flows from what I was just talking about. Remember, the jury split. The jury accepted Neovast's defenses as to the primary trade secret claims one, two, and three. And based on those, the damages expert said, well, you get 50% of the value. Well, if one component out of the 30 is all that the jury found, or even six components out of the 30 was all the jury found were misappropriated, then that cannot possibly be substantial evidence to support the damages finding. And this was preserved, this was challenged in the new trial motion. And so- But again, only as a new trial motion, right? Yes, but it was a dauber motion originally, Your Honor. So that was preserved in the context of the evidentiary issue on the front end, and then a new trial motion on the back end. I'm not sure that, unlike some of the earlier issues, I'm not sure that a directed verdict would have been appropriate. In this case, I really do think. I mean, to be blunt, looking at the record as a relative newcomer to the case, it seems that both parties tried this as if they thought it was gonna be an either or. That all the trade secrets were misappropriated, or none of them were. And it doesn't seem that anyone really contemplated that only trade secrets four, five, and six could be misappropriated, because Mr. Wagner, their damages expert, offers nothing but ipsedixit as to how, say, a different strut width could justify 50% damages. There's no analysis- You can't rewrite the testimony and the trial evidence. Let's hear from the other side, and we'll save you some time for rebuttal. Thank you, Your Honor. Thank you, Your Honors, and good afternoon. On inventorship, Judge Burroughs did not clearly err. That's the standard here. We don't believe appellant has met his burden of showing a mistake by a definite and firm conviction. He didn't discuss Solem at all. Isn't that a problem? Well, no, Your Honor. Again, the way that a lot of this evidence was presented was simply in post-trial motions. But what appellants have not shown is that Solem had any disclosure with respect to anchoring against the trigone. And there were a number of claimed elements in Claim 1 that appellants didn't disagree were missing. For example, the atrial skirt, the ventricular skirt, they didn't address these in their reply. No evidence that there would actually be a contact on the trigone itself. That's something that the Cartier-Q Rev-E device did do, and the district court correctly found. Quasi by happenstance. Well, I think that may be overstating it a little bit in that we had these 12 anchors, and the only thing we couldn't say is which of the 12 would necessarily contact. Because it would rotate, and it was basically symmetric. Correct, Your Honor. And so there was enough of the circumference of this annulus around the valve that was this trigone, this more rigid tissue. And there wasn't any argument, at least I didn't see any, that if I remember your figures, you've got these 12 things that are spaced 30 degrees in the trigones. And there wasn't any argument that those could actually fit exactly between trigones so that you never, by necessity, hit one of them? No, Your Honor. The testimony from Dr. Bavaria was that these trigones extended about a 60 degree arc around the circumference. So imagine, say, 10 minutes on your clock face, and we had these anchors at 12 spaces every five minutes. So you were always going to have some overlap by virtue of how closely spaced those anchors were, 30 degrees apart versus the two trigones, each 60 degrees. And the district court acknowledged this correctly at 893 in her memorandum and order. And looking at that contribution, the appellant has said there was nothing novel that we provided. Well, we did present evidence that all of the elements of Claim 1 of the patent were, in fact, present in our revie. Mr. Ratz testified to that at 2609 through 14. But I thought his key point is that they may have been present, but they weren't novel. Well, that's certainly not going to be the case when Neovask itself argued for the novelty of the claim as a whole. So we're in a position to say, everything in that claim we had, the only thing allegedly missing is this one word, trigonal. Right, construed to mean by design. I'm not entirely sure whether yours is by design or not by design. And it was designed in a way that, as a matter of fact,  But I'm not sure if that comes by design. But our point is that it's such a small step from saying, here's 12 anchors. Some of them will necessarily contact a trigonal to what's claimed is to add this word trigonal to say, well, we're going to pre-design which of those. Now, when we compare that in the context of the whole invention, which is what the district court correctly did, at the time, no one had ever made a working transcatheter mitral valve implantation device. Mr. Lane, the named inventor, had never worked on designing one himself before he started working with the Cartier-Q inventors. And in the context of the prior art, we weren't simply explaining to the Neovask inventors, here's what's been done before. Start with this. This information, for example, Chao, as your honor noted, wasn't even known. It was secret at that point in time. So against that whole background, the contribution was qualitatively quite significant. And we did contribute. Did the district court find some claimed elements missing from Chao, or simply conclude that Chao doesn't matter because it was secret at the time? I don't believe that the district court addressed those specifics. And again, nor was there trial testimony that Chao did disclose specific elements or not. It was something that was addressed only. It was put into the record at the close of trial, and no witnesses described it. At no point did we have anything other than attorney argument by Neovask counsel about it. Is this all a matter on which you have the burden, including the burden of showing that your allegedly significant contribution was not in the prior art? We certainly have the ultimate burden of persuasion on the issue of having contributed qualitatively to the invention. And again, that is measured in part against whether we were simply conveying well-known principles in the prior art. That's the Panu standard. And we believe we met our initial burden of production. Right, but this is something where one of the formulations, simply conveying well-known formulations, quite easily excludes secret prior art. But there's this other formulation in some of the cases about excluding contributions that appear in the prior art, which at least raises a question whether the special kind of 102E prior art is an exception to that. Well, and I would say several things to that, Your Honor. First off, Chao wasn't 102E art at the time that this collaborative co-inventive process occurred, number one. Number two, we know from other areas that we can have two sets of inventors. For example, in an interference context, we could have one group of inventors and another group of inventors both invent the same thing. That doesn't make them any less inventors that they're working on it at the same time. And we don't need to decide whether this Lane patent is valid under 102E under Chao. That wasn't the issue here. And in fact, prima facie, the earliest priority date that Chao could be entitled to is its provisional filing date, which was in December of 2009. And we showed that we provided the breakthrough design, this Rev-D design, in October of 2009, two months prior. And that's at A2564 through five. So we certainly have rebutted, to the extent we need to rebut Chao as being prior, we have rebutted. We show conception, reduction to practice, and communication to the knee of ask inventors all before the earliest possible Chao priority date, which appellants never even presented a record that Chao was entitled to that provisional date. The provisional application was never a record. So if I could turn to the trade secret issues, I think it's important, again, to look at the standard of review here. There was reference to evidence supporting the jury verdict. Well, we're here on the new trial standard here. And appellants have to show that the verdict was against the clear weight of the evidence, so much so that there's a miscarriage of justice. Do you know the answer to the question I asked about whether, for purposes of this new trial, the correct legal standard being used to assess as the metric for assessing the evidence is the one given in the jury instructions, where that's not objected to, or the correct law, if that happens to be different? Because it is the correct law in the JML context. Is the new trial different? I don't have authority. I can cite on that, Your Honor. I do think that it makes sense that the jury instruction, which was not objected to, be the operative legal standard. And I do believe it is consistent with the standard that Judge Burroughs did apply in the new trial context. And it was all in the context of this continuous use requirement for trade secrets under Massachusetts law. And there was an instruction to that effect, which did make clear that we needed to show that we had something other than a single ephemeral event. The jury instruction had examples of things like bid information or salaries that would be valuable for just a moment in time, but not in the future. And in contrast to that, we did present significant evidence that the history was built upon throughout the development of the project, and that it was used in later versions. In fact, the first in-human sample of this TMVI device was testified by Dr. Quadri as using the same anchoring method as in the prototypes shared with Nievask. And that testimony is from 2450. As to Nievask's point about the unavailability under Massachusetts law of negative trade secrets based on the 1971 Superior Court decision, I don't remember whether you, in your red brief, disputed that that was a correct view of Massachusetts law. Well, yeah. Our view is that the correct Massachusetts law was incorporated in the jury instruction. It derives from the restatement. And we don't have a Massachusetts case which does anything other than that materials development case in dicta, making a passing reference to what it called mistakes to be avoided as distinguished from valuable practice. I guess, I don't remember your saying in your red brief, the materials case from 1971 is not the best view of Massachusetts law as it would now properly be understood. It was dicta there. It was unpublished. It was a trial court decision. It has not ever been followed. And if you're asking the question, what would Massachusetts Supreme Judicial Court now decide on the question, it would now decide what everywhere else is going to go on. Well, I think we did point out it was dicta. And we did point out that, ultimately, the trade secret was upheld in that case. I don't think that case so strongly supports the view appellants want to present, which is that there is this bright line rule, no negative know-how can ever be protected. What the court in that case did, somewhat, I think we've got a better case than happened in that case. There, the defendant worked on a trade secret for a metal coating process. He never quite perfected it. He never quite got it to work. But he then left the plaintiff, joined up with the defendant, shortly after, makes the final few steps in the R&D process. And it is successful. The plaintiff sues him and prevails. And the ultimate outcome in that case is that that was a protectable trade secret, even though, at the time, he hadn't finalized it. And again, if all we had, I think this might be an easier case for the appellants if they could say, well, all we did is we showed up with a burnt offering of, here's a prototype that doesn't work. We don't know why it doesn't work. And we've given up. We gave it the one shot, and now we're done. That might create a more interesting issue under what does continuous use mean and what does that material development case mean in terms of not protecting, simply, mistakes to be avoided. Here, we've got both the learning from that experience in terms of what to do as we go forward. We've got the testimony that that experience is drawn upon still to this day. And so we have met the continuous use requirement as instructed. And like I said, I think we've got a stronger case than even materials development, which did support the trade secret owner. OK, are you ready to turn to the cross appeal? Any more questions? OK, is the cross appeal still valid? The judge referred to the public interest. And you have a good deal of experience between the time of that decision and now. Are you still pressing the cross appeal? Yes, we are, Your Honor. And the parties are in a similar posture in that they are still in the early stage of these clinical trials. No one has obtained regulatory approval for the product. It's uncertain when or if they will. Well, if it's not approved, what good would a cross appeal 18 months from the date of the district court judgment do you any good? Well, the trade secret is our intellectual property. And we believe we're entitled to exclusivity with respect to that. To stop the clinical trials? To stop the trials. And that was what the appellant agreed to in the nondisclosure agreement, that in the event of any breach, that there would not be sufficient monetary damages. One of the things that I found most pertinent in the trial court's analysis was her thoughtful conclusion that in carefully reading your expert's opinion with respect to how he got to his numbers, now, granted the jury discounted the numbers, but that in calculating those numbers, it was because he was, in part, accounting for an 18-month head start. Right, Mr. Wagner did use the 18-month head start as one of the Georgia-Pacific factors in his analysis. But we were starting from this construct of the hypothetical negotiation where we were forced to be treated as a willing licensor, when in reality, the parties agreed that neither of them would have ever licensed their intellectual property in this context, number one. And number two, the nondisclosure agreement, uncharacteristically, was not addressed by Judge Burroughs in her very thorough opinion. Maybe that's because the nondisclosure agreement goes no further than saying, yes, an injunction will be warranted. But you're asking for a particular injunction, put a stop for 18 months. It's easy enough to read the NDA provision as in particular, as being satisfied by a bar on use injunction for some period. So it doesn't seem to me to establish that you're entitled to the shutdown for 18 months. Well, I think the 18-month shutdown is actually a temporary injunction, actually less severe than an entire bar on any use permanently. But also, we did propose the alternative to the district court, which would have been an even shorter injunction, namely, leave the injunction in place unless and until we are paid on the judgment. So the district court said, it's a double recovery because you're getting the damage award, which represented a hypothetical license we never would have entered. But we haven't been paid the royalties, even under that hypothesis. Is there a threat that you won't be paid? Yes, Your Honor, there certainly is. There's right now $112 million judgment. And that judgment is state pending appeal. But only $70 million of that has been placed in escrow to secure the judgment. And that was a result of a contested stay motion, where we sought the full judgment. But that's not this action, is it? If there were indeed an issue of non-payment, you're saying that that's before us? It is indirectly, Your Honor, in that the district court justified denying the injunction by viewing it as a double recovery. Couldn't you go back to the district court if, in fact, you're not paid? Well, we could go back to the district court and certainly ask for enforcement of the judgment. But you could also ask for her to reconsider the injunction, couldn't you? I would certainly like to be able to do that, although we raised that as the issue previously. And certainly some direction from this court on that to vacate that portion of the denial would be helpful so that we're not faced. I'm not sure you quite appealed that in your red brief. Your red brief statement of the issues on the cross-appeal is only about the 18-month shutdown injunction. We did address it in one of our briefs, Your Honor. I think it was a different color. And I will double check on that. I think I'm at the end of my time. If I could reserve just a bit to respond on the injunction. Thank you. OK. Thank you, Mr. Zagler. Mr. Wolfe? Thank you, Your Honor. A few items on inventorship issue. Your Honor asked about the happenstance definition of the trigonal anchoring region. They're actually in different vertical planes, Your Honor. There was analysis that if this were to get sent back, this is something that could be talked about. But the trigons actually sit at a different place than the 36. So it's not about the face of a clock. It's an up-down issue. Now, we thought, at least trial counsel thought that when we won the Markman, that this issue was put to bed entirely. Apparently, they're trying to argue that even under the Markman, there's a backdoor infringement, where infringement's not quite the right word, but practicing. If they want to argue that below, then we can get into the physiology of it. But this isn't a cute argument. They're very different places on the heart. One is, again, the structure itself, and the other are the valves. So let me just say that there's a difference there. SOLEM, Your Honor, hits on it absolutely. It was never addressed at all by the district court. And CHOW should be addressed in the proper light. All of this can go back for a proper consideration, a comparison of, in light of the law that we've talked about, the proper comparisons. Briefly on the damages, and then I'll get to the injunction request. We talked about the 50% issue, which is how can one or two or three equal 50% of the problem. I heard nothing from counsel on that particular issue. We didn't get to the ex post argument we made in the brief, and that is a significant one. That in the window between 2010 and 2015, there were animal studies, there were cadaver studies,  All of that took uncertainty out of the equation. All of that uncertainty being taken out of the equation inured to their benefit from Mr. Wagner's perspective. So we think that a new trial saying, no, no, when we mean hypothetical negotiation, you can look in the book of wisdom as a cross-check, as a double-check, as a reality check, but you don't write it to decide what the value of the first check should be. And that's what Mr. Wagner did. On to the injunction, just a few points. By April or May of 2010, it is undisputed that everything that was purportedly a trade secret was in the public domain. Voluntarily, they had a published patent application, they had trade show presentations, et cetera. So what they're saying is more than seven years later, not knowing which, if either of these companies' products will actually save lives, we're going to hold us back from doing clinical research for 18 months to figure out what works and what doesn't. That doesn't seem to be something that, it was an abuse of discretion for the district court judge to say, no, I want to see how the science plays out. It's to all of our benefits. The other thing, Your Honor rightly points out that it talks about an injunction, not a specific injunction. In fact, the court did order certain elements of injunctive relief. We had to destroy certain documents, return certain documents, et cetera. So there was equitable relief given in this case, just not this 18-month specific kind of equitable relief. The court did not abuse its discretion. I think I'm out of time. I think I'm on the back side. But I would, particularly on the damages issue, if there's anything that the court has any concerns about with regard to damages, we think that is particularly appropriate for a new trial in the light of the way the split verdict caught both parties by surprise. Thank you, Mr. Wolff. Now, Mr. Skunker, you get the last word on the cross-appeal, please, just on the injunction. On the injunction, I disagree with my colleague's representation that all of the confidential information and trade secrets were made public as of the, shortly after the parties did business together, the actual prototypes and the sharing of the front row view, as the district court referred to it, of our development process was something that no one else participated in, either during the course of the development and collaboration or afterwards. A patent application publishing did not have the same level of detail as the kind of information that was actually being shared. But the real problem, I think, is the judge's emphasis on the public interest as a significant factor in allowing this to proceed. And to that, Your Honor, I would respond that this court in 2016 decided the WBIPV Kohler case. And similarly there, the district court looked at the fact that the technology at issue could potentially be lifesaving. And this court said it was error to use that as a bright line rule to say that the public interest in that potential safety outweighed the interest in enforcing IP rights. And in that case, Kohler, the parties actually were selling products. There was actually real product available. Here, we're at a much earlier stage. And the district court candidly admitted that it couldn't know which of these products could ultimately get to market and make a difference. So I think the court went even farther towards a categorical rule than in that Kohler case. And this court overturned the denial of the injunction there.   Thank you both. Thank you, Your Honor.